Case No. 19-3088

_____

## UNITED STATES COURT OF APPEALS OF THE TENTH CIRCUIT

_____

**WENDY COUSER**
Plaintiff/Appellee

**vs.**

**CHAD GAY, et al**
Defendants/Appellant

_____

## KANSAS SHERIFFS' ASSOCIATION
## BRIEF AS AMICUS CURIAE
## IN SUPPORT OF DEFENDANT/APPELLANT CHAD GAY
## SEEKING REVERSAL OF THE DISTRICT COURT

_____

**Appeal from the United States District Court
for the District of Kansas**
The Honorable John W. Broomes, Judge
District Court Case No.: 6:18-CV-01221-JWB-GEB

_____

**Allen G. Glendenning, #12187
1321 Main - Suite 300
P.O. Drawer 1110
Great Bend, Kansas 67530
(620) 792-8231 aglenden@wcrf.com
Attorneys for Kansas Sheriffs'
Association**

## TABLE OF CONTENTS

TABLE OF CONTENTS ..........................................................i

TABLE OF AUTHORITIES ...............................................i, ii

OTHER RESOURCES .....................................................iii, iv

CORPORATE DISCLOSURE STATEMENT ...................................iv

STATEMENT OF INTEREST ................................................ 1

ARGUMENT ............................................................ ..................... 1

    I.     Kansas Authorizes Sheriffs to Act Interstate on Behalf of the State... 2

    II.    The Sheriff Answers to the State Executive and Judicial Branches...... 4

    III.   The Sheriff Keeps the Sovereign's Peace........................................... 10

CONCLUSION................................................................ 14

CERTIFICATE OF COMPLIANCE ............. ........................... 15

CERTIFICATE OF DIGITAL SUBMISSION ............................ 16

CERTIFICATE OF SERVICE ...................................... 16, 17

## TABLE OF AUTHORITIES

### Rules

F.R.A.P. 29(a) ....................................................................... 1

F.R.A.P. 29(a)(3) ................................................................. 1

## Statutes

Revised Statutes, Kansas, 1923, Ch. 21, Art. 10 ..................................................... 5

K.S.A. 19-801a ........................................................................................................ 4

K.S.A. 19-804 ......................................................................................................... 4

K.S.A. 19-811 .......................................................................................................... 9

K.S.A. 19-812 ........................................................................................................ 10

K.S.A. 19-813 ........................................................................................................ 10

K.S.A. 19-822 .......................................................................................................... 9

K.S.A. 19-824 .......................................................................................................... 9

K.S.A. 19-828 .......................................................................................................... 3

K.S.A. 19-1916 ...................................................................................................... 10

K.S.A. 21-1803 ........................................................................................................ 6

K.S.A. 22-4901-4913 .............................................................................................. 9

K.S.A. 47-612 .......................................................................................................... 7

K.S.A. 47-613 ...................................................................................................... 7, 8

K.S.A. 47-618 .......................................................................................................... 8

K.S.A. 48-242 ........................................................................................................ 13

K.S.A. 48-243 .................................................................................................... 9, 13

K.S.A 74-5,119(c) ................................................................................................... 7

K.S.A 74-560(b) ...................................................................................................... 7

K.S.A. 75-712 .......................................................................................................... 4

K.S.A. 75-7c05 ........................................................................................................ 9

Laws Relating to the Militia, Article IX Section 29 (1885) ................................. 12

Laws Relating to the Militia, Article IX Section 30 (1885) ............................ 12, 13

Kansas Militia Law of 1901 and 1903 Section 42 ................................................ 13

## Cases

*Board of County Commissioners v. Nielander*,
275 Kan. 257 (2003.) ................................................................... 4

*Flint v. Noyes*,
27 Kan. 351 (1882) ...................................................................... 3

*Hernandez v. Conde,*
442 F. Supp. 2d 1131, 1138 (D. Kan. 2006) ............................... 3

*Lumry v. State,*
305 Kan. 545, 549, 385 P. 3d 479, 483 (2016) .......................... 3

*McMillan v. Monroe County, Ala.,*
520 U.S. 781, (1997) ................................................ 2, 4, 5, 8, 10

Vasquez v. Lewis,
No. 12-40210RDR, 2013 U.S. Dist Lexis 3306, at *7 (D. Kan. Jan. 9, 2013) ......... 3

## OTHER RESOURCES

*Galena's Prize Fight*, The Kansas Semi-weekly Capital,  March 22, 1895, at 5 ..... 5

William Blackstone, *Commentaries on the Laws of England*, *112 (1765-1769) .......1

Wichita Daily Eagle, May 25, 1895, at 1 .................................................5

The Kiowa Journal, May 30, 1895, at 1, *MORRILL AT THE RINGSIDE* ............... 5

*Governor Instructs the Sheriff to Prevent the Dixon-Gardner Fight*, at 1............... 5

*Stops the Fight; Governor order Sheriff Everhardy to Act*,

The Wichita Beacon, August 8, 1901, at 1. .................................................6

*Governor Directs Sheriff to Prevent Ku Klux Parade*,

Winfield Daily Courier, July 5, 1922, at 1 ................................................. 6

The Headlight, August 31, 1885, at 8 ................................................... 7

The Wathena Times and
The Troy Republican Consolidated, February 20, 1914, at 8 ....................................7
The Kansas Emergency Management Handbook, August 2007, (pp. 102) ............. 8
Kansas Response Plan 2017 ................................................................................. 8
*Kansas Again is All Flooded*, Fort Scott Daily Tribune, June 11, 1915, at 1 ........... 9
Letter from Sheriff R.M. Jacks to Governor Thomas Carney (June 8, 1864) ........... 11
Judge Ruppenthal, *Russell Rustlings*, Lucas Independent, May 10, 1917, at 4 ........ 11
*Kan. Ready for Registration;*
*Sheriffs' Reports to Governor Indicate Everything in Readiness*,
The Morning Chronicle, May 24, 1917, at 1 .......................................................... 11
James H. Ducker, *Workers, Townsmen, and the Governor:*
*The Santa Fe Enginemen's Strike, 1878*, Vol. 5, No.1 Kansas History,
 23, 27 (Spring 1982), ........................................................................................ 11
Letter from Governor Martin (March 25, 1886) .................................................... 12
Henry F. Mason, *County Seat Controversies in Southwestern Kansas*,
February 1933 (vol. 2, no. 1), pages 45 to 65 ....................................................... 13
Telegram from Governor John Martin to Colonel A.B. Campbell
(March 15, 1886) ................................................................................................. 13
Letter from Governor John Martin to Attorney David Kelso
(March 13, 1886) ................................................................................................. 13

## CORPORATE DISCLOSURE STATEMENT

The Kansas Sheriffs' Association is a non-profit charitable organization organized under the laws of Kansas. It has no parent company and has issued no stock.

## STATEMENT OF INTEREST

Amicus Curia, the Kansas Sheriffs' Association, is dedicated to preserving the history of the office of Kansas Sheriff and supporting Kansas Sheriffs in carrying out the various duties imposed upon them by state law. This includes monitoring and assisting in legislation and legal proceedings affecting the office of Sheriff.

The Sheriff's eleventh amendment immunity is important to prevent conflicting and confusing legal pronouncements on his status as an arm of the state and his ability to carry out his state assigned duties. The association seeks to provide a historic perspective on the issue before the court in support of Sheriff Gay without duplicating the brief filed on his behalf.

This brief is filed pursuant to F.R.A.P. 29(a). The motion required by 29(a)(3) is being filed with this brief.

This brief was not authored in whole or in part by a party's counsel. No money intended to fund this brief was contributed by a party or a party's counsel. No person other than the Kansas Sheriff's Association has contributed money intended to fund this brief.

## ARGUMENT

The office of Sheriff developed as the sovereign's law enforcement at the local level. *See* William Blackstone, *Commentaries on the Laws of England*, *112 (1765-1769). "As the basic forms of English government were transplanted in our country,

1

it also became the common understanding here that the sheriff was in reality an officer of the State, and ultimately represented the State in fulfilling his duty to keep the peace." *McMillan v. Monroe County, Ala.*, 520 U.S. 781, 794 (1997). Though "chosen locally by the […] [county's] inhabitants, the sheriff did 'all the king's business in the county' and was 'the keeper of the king's peace.'" *Id.,* at 793 (1997) (quoting William Blackstone, *Commentaries on the Laws of England*, 328 (1765).

Kansas has continued this conception of the sheriff as an arm of the sovereign. From the time the office of Sheriff was established in the Kansas Constitution to the present, the Kansas Sheriff has been a state officer elected in the same manner as state representatives, senators, treasurers, county attorneys and judges (who have been held to be state actors). The Sheriff is not subordinate to the local authorities nor is he the local government's final policymaker. His duties and the policies he is required to carry out are assigned to him by the state and he is supervised by the State's executive and judicial branches.

## I.    <u>Kansas Authorizes Sheriffs to Act Interstate on Behalf of the State.</u>

A clear indicator that the Sheriff is an arm of the sovereign is that the State has authorized the Sheriff to cross state lines in service of state policy and judicial authority, and to enter into agreements with law enforcement officers of other states and, thereby, endow those foreign officers with the rights and immunities afforded by Kansas state law.

At one time, the Kansas Legislature empowered the Sheriff to cross state lines to serve summons issued by state courts. *See Flint v. Noyes*, 27 Kan. 351 (1882) (citing Civ. Code § 76). This function was not delegable to any other officer. *See Flint v. Noyes*, 27 Kan. 351, 353-54 (1882).

Current state law permits Kansas counties to enter into agreements with political subdivisions in neighboring states to form multijurisdictional law enforcement groups. However, they can only do so if they first obtain the agreement of the Sheriff in that county. K.S.A. 19-828.

When a Sheriff authorizes the county to make such agreements, he is, in effect deputizing foreign state's law enforcement officers. K.S.A. 19-828. This act of the sheriff grants foreign law enforcement officers "the same powers and immunities as law enforcement officers certified and commissioned in Kansas" while conducting investigations to enforce drug and controlled substance laws or engaging in prevention, detection or investigation of terroristic activity. K.S.A. 19-828.

The "powers and immunities [of] law enforcement officers certified and commissioned in Kansas" – which the Sheriff is authorized to confer -- include those held by the KBI and KHP - both protected by eleventh amendment immunity. *See Hernandez v. Conde*, 442 F. Supp. 2d 1131, 1138 (D. Kan. 2006); *See Vasquez v. Lewis*, No. 12-40210RDR, 2013 U.S. Dist Lexis 3306, at *7 (D. Kan. Jan. 9, 2013); *See Lumry v. State*, 305 Kan. 545, 549, 385 P. 3d 479, 483 (2016). The Kansas

3

statute defining the powers and duties of Kansas Bureau of Investigations officers expressly equates their powers and privileges with those of Kansas Sheriffs. K.S.A. 75-712. "Each member of the bureau shall possess all powers and privileges which are now or may be hereafter given to the sheriffs of Kansas." K.S.A. 75-712.

## II.     The Sheriff Answers to the State Executive and Judicial Branches.

The Kansas Sheriff is not subordinate to local county authorities. *See Board of County Commissioners v. Nielander,* 275 Kan 257 (2003.) But the Sheriff has historically been, and is still required to answer to the State, particularly the executive and judicial branches.

Upon entering his duties, the Sheriff is required by State Statute to post a bond "to the state of Kansas," not the county. K.S.A. 19-801a. When a vacancy occurs in the office of Sheriff, it is the governor, not local authorities who appoints his successor to fill the term of his office. K.S.A. 19-804. This statute, which "augments the power of the Governor" while decreasing the local populace's power to fill unexpected sheriff vacancies, echoes the centralized control that Alabama governor's exercised in *McMillan. McMillan,* 520 U.S. at 788.

Historically, when anyone was taken from the sheriff's custody and lynched, it was the governor's decision whether the sheriff could ever hold that office again. The lynching itself was "evidence of failure on the part of the sheriff to do his duty." Such evidence terminated a sheriff's tenure in office, barring him from holding the

office again unless he appealed to the governor within ten days. If the governor found the sheriff "used reasonable effort" and performed his duties under the law he was to reinstate the sheriff and issue a certificate of reinstatement. *See,* Revised Statutes, Kansas, 1923, Ch. 21, Art. 10. In *McMillan* the Supreme court found that when Alabama made this an impeachable offense it was a "significant step[] in an attempt to solidify the place of sheriffs in the executive department." *McMillan*, 520 U.S. at 788.

Kansas Governors did not limit their involvement with sheriffs to tenure matters. Governors would also order sheriffs to perform their law enforcement duties—even on such mundane matters as preventing boxing matches and parades. *See Galena's Prize Fight*, The Kansas Semi-weekly Capital, March 22, 1895, at 5 (Governor Morill telegram to the sheriff of Cherokee County: "I have been informed that arrangements have been made for a prize fight in your county at the city of Galena. You are hereby ordered to prevent the same at all hazards, using the full authority of your position and arresting promptly any person attempting to participate in the same, not only the principals, but any person aiding, assisting or encouraging the same"); Wichita Daily Eagle, May 25, 1895, at 1; The Kiowa Journal, May 30, 1895, at 1 *MORRILL AT THE RINGSIDE; Governor Instructs the Sheriff to Prevent the Dixon-Gardner Fight*, at 1. ("Sheriff Rothenberger received a letter this morning from Governir [sic] Morill with explicit instructions to prevent

the Dixon-Gardner prize fight…"); *Stops the Fight; Governor order Sheriff Everhardy to Act*, The Wichita Beacon, August 8, 1901, at 1. ("Gov. Stanley today wired Sheriff Everhardy of Leavenworth, the following message: 'I notice by the papers there is to be a prize fight in your city tonight, Stop it or procedures will be instituted against officers failing to do their duty'… Kansas has a stringent anti-prize fight law and the governor insists that it be obeyed."); *Governor Directs Sheriff to Prevent Ku Klux Parade*, Winfield Daily Courier, July 5, 1922, at 1 (Governor Allen's announcement "I am directing the county attorney and sheriff of Cowley county to prevent the demonstration and parade announced by the Ku Klux Klan for Friday night…") ("…Governor Allen had conveyed instructions to the sheriff… that the Ku Klux parade should not be allowed at this time on account of the strike").

Current Kansas law continues this obligation. If a sheriff does not "arrest[,] take before […][the] judge […] and give notice to the county or district attorney" individuals promoting or engaged in prize fighting" that "failure or neglect… shall work a forfeiture of his office, and it shall be the duty of the county or district attorney for such county to cause such forfeiture to be adjudged and such officer removed from his office, by a proper civil action brought for that purpose by the county or district attorney (both of whom are state actors) in the district court of such county. K.S.A. 21-1803.

State executive control over sheriffs is not limited to sporting events and parades. It extends to protecting the state economy from infectious disease.

Historically, the Governor exercised this control directly. "Gov[ernor] Martin […] issued a proclamation against the importation of infectious cattle… [and] directed all sheriffs and deputies to promptly take charge of or retain any cattle sought to be driven across any county in violation of law and report the same to the Live Stock Sanitary Commission." The Headlight, August 31, 1885, at 8. *See also* The Wathena Times and The Troy Republican Consolidated, February 20, 1914, at 8 ("Sheriff Joe Griffen… Killed a glandered horse… the fifth he has killed… [t]he horse was appraised by the sheriff, acting for the State Livestock Comission…"). .

Today the Sheriff is responsible to the Animal Health Commissioner in these matters. The Animal Health Commissioner is a member of the state executive branch and appointed by an appointee of the Governor. *See* K.S.A 74-5,119 (c) and 74-560(b). If the Commissioner determines certain animals in the state are capable of communicating infectious disease, he can order sheriffs "to take into custody and keep such animals subject to such quarantine regulations as the animal health commissioner may prescribe." K.S.A 47-612.

Upon receiving such an order, a sheriff "shall proceed without delay to the place" to where the infectious animal is. *See* K.S.A. 47-613. The sheriff must examine the animal and "…report immediately" to the Animal Health Commissioner

7

and enforce the Commissioner's temporary quarantine regulations. K.S.A. 47-613. This statute explicitly covers the sheriff with sovereign immunity stating "[n]o sheriff who takes or detains such animals under the provisions of this act shall be liable to the owner or owners of such animals for any damages by reason of such taking or detention or by any other duties directed by law." K.S.A. 47-613.

In enforcing the law, the sheriff works for the Commissioner who "shall have power to call upon any sheriff, undersheriff or deputy sheriff to execute" his orders which they must obey. K.S.A. 47-618. This type of control by the executive branch "support[s] the conclusion" that sheriffs are state actors. *See McMillan*, 520 U.S. at 789-91. (Stating "[w]hile the county commission thus has no direct control over how the sheriff fulfills his law enforcement duty, the governor and the attorney general do have this kind of control") (The Supreme court takes particular note that the sheriff is required to "proceed promptly" and "must 'promptly' write a report to the state official in charge.").

Kansas state emergency management policy puts the Sheriff at the forefront of coordinating activities. While "[l]ocal law enforcement officials maintain authority within their own jurisdiction" it is up to "the county sheriff's office [to] coordinat[e] [those] activities." The Kansas Emergency Management Handbook, August 2007, (pp. 102); *See also* Kansas Response Plan 2017, http://www.kansastag.gov/AdvHTML_doc_upload/2017%20KRP%20FINAL.pdf,

(last accessed July 29, 2109 at 10:19 a.m.).  When those "situation[s] become[]
severe, it is the sheriff's office that … request[s] the assistance of State and Federal
law enforcement agencies."  *Id.*

The state's reliance on sheriffs to respond to natural disasters is not new.
During one flood the governor ordered a sheriff "to take complete charge of the
Kansas City Southern Bridge across the Kansas River at Kansas City," *Kansas Again
is All Flooded*, Fort Scott Daily Tribune, June 11, 1915, at 1.

Beyond utilizing sheriffs to respond to such crises, Kansas assigns the bulk of a
sheriff's regular functions.  These include enforcing the laws of Kansas as well as
taking "charge and custody of the jail of his county," processing concealed carry
permits and registering sex offenders.  K.S.A 19-811; K.S.A 48-243; K.S.A. 75-
7c05 (The responsibilities related to this include processing and handling a $100
portion of the payment that goes to the attorney general while the sheriff retains
$32.50); K.S.A. 22-4901-4913.

State control over its sheriffs extends even to their clothes.  Kansas requires,
with certain exceptions, sheriff's and their deputies wear uniforms. K.S.A. 19-822.
These uniforms are to "be readily distinguishable from… [that] of other law
enforcement agencies" and their color and design must be designated by the sheriff.
K.S.A. 19-824.

Along with serving the executive branch, sheriffs are servants of the court. The sheriff "serves and executes, according to law, all process, writs, precepts… and orders made by lawful authority and to him directed." *See* K.S.A. 19-812. The lawful authority making those process, writs, precepts and orders can come from any state court not just those inside the sheriff's own county. Kansas Sheriffs are also required to accept into their jails prisoners from outside the county, upon the orders of a state judge. K.S.A. 19-1916.

This is similar to the statutes from Alabama that the United States Supreme Court found "support the conclusion" that Alabama Sheriffs were state actors for law enforcement purposes. *McMillan*, 520 U.S. at 789-90.

### III.    <u>The Sheriff Keeps the Sovereign's Peace.</u>

From the very beginning of the state, Kansas Sheriffs have been tasked with preserving the peace and "quiet[ing] all affrays, riots and unlawful assemblies and insurrections." K.S.A. 19-813. This is a statewide concern, not a purely local one. That statute authorizes the sheriff to conscript and command forces in fulfilling this duty.

At least back to the Civil War the sheriff looked to the Governor for permission and guidance on peace keeping matters. For example, a sheriff wrote the governor for troop raising authority to combat interstate raiders.[1]

In the First World War, Kansas and the United States relied on Sheriffs to organize the draft boards.[2] The Sheriffs reported their activities directly to the governor.[3]

The state did not supervise such activities merely during war time. Governor George T. Anthony sought the Lyons County Sheriff's help raising and leading militia during the1878 Santa Fe enginemen's strike in 1882.[4]

---

[1] Letter from Sheriff R.M. Jacks to Governor Thomas Carney (June 8, 1864) (on file with the Kansas Historical Society), www.kansasmemory.org/item/213233 (requesting permission to raise "one or two" companies of Hundred days men against Missouri bushwhackers).

[2] Judge Ruppenthal, *Russell Rustlings*, Lucas Independent, May 10, 1917, at 4 ("[t]he papers are saying that the governor directs the sheriff, county clerk and county physician in each county to conduct the draft for the army").

[3] *Kan. Ready for Registration; Sheriffs' Reports to Governor Indicate Everything in Readiness*, The Morning Chronicle, May 24, 1917, at 1 ("telegrams were pouring into the office of Governor Capper from sheriffs in each county of the state reporting the organization of the county registration boards for national registration day June 5. "); Woodrow Wilson, *Proclamation Regarding Military Draft*, May 19, 1917.

[4] James H. Ducker, *Workers, Townsmen, and the Governor: The Santa Fe Enginemen's Strike, 1878*, Vol. 5, No.1 Kansas History, 23, 27 (Spring 1982), https://www.kshs.org/publicat/history/1982spring_ducker.pdf, (the governor asked if the sheriff "could raise 50 men and offer[ed] to finance the operation and muster 50 men as militia under the sheriff's command.")

When a strike shut down Kansas railroads a few years later, Governor Martin responded similarly, calling upon sheriffs to preserve the peace and protect property. Governor Martin made clear that the policy Kansas Sheriffs were to implement was to "see that the commerce of the State is not interrupted by violence or lawless acts" and "that the commrce [sic] of the State may be resumed…" [5]

Historically, Kansas State policy of law and order extended authority to Kansas sheriffs to command the state's military "[i]n cases of any breach of the peace, tumult, riot or resistance to process in this state, or imminent danger thereof." *Laws Relating to the Militia*, Article IX Section 29 (1885). The legislature declared "it shall be lawful for the sheriff of any county… to call for aid upon the commanding officer of any regiment, battalion or company." *Laws Relating to the Militia*, Article IX Section 29 (1885). A sheriff's call for aid imposed a duty on those commanding officer "… to order out in aid of the civil authorities the military force." *Laws Relating to the Militia*, Article IX Section 29 (1885). The act makes clear Kansas' military officers were "subject, as provided by law, to the sheriff… who shall require his aid…" *Laws Relating to the Militia*, Article IX Section 30 (1885).

---

[5] Letter from Governor Martin (March 25, 1886) (on file at the Kansas Historical Society), www.kansasmemory.org/item/211994.

Not only were the officers subject to the sheriff but an officer "refusing or neglecting to obey the lawful order of such sheriff" or who interfered, hindered or prevented the troops "of his command from performing such duty… [were] liable to… imprisonment in the county jail for a period not exceeding six months." *Laws Relating to the Militia*, Article IX Section 30 (1885).

Current Kansas law continues the authority of Kansas Sheriffs to call for state troops and requires the commanding officer of the militia sent in response, to report to the Sheriff. K.S.A. 48-242; K.S.A 48-243; Kansas Militia Law of 1901 and 1903 Section 42. *See also* Henry F. Mason, *County Seat Controversies in Southwestern Kansas*, February 1933 (vol. 2, no. 1), pages 45 to 65, https://www.kshs.org/p/county-seat-controversies-in-southwestern-kansas/12569, (In 1888 the sheriff of Stevens County wired Governor Martin during a county seat war "asking that militia be sent to preserve the peace. Brig. Gen. Murray Myers was at once sent to the scene of hostilities to examine and report. He found each town a fortified camp, the inhabitants fully aroused and ready and willing for a general engagement. Believing that bloodshed was imminent he brought on two companies of militia and disarmed the belligerent forces…"); Telegram from Governor John Martin to Colonel A.B. Campbell (March 15, 1886) (on file with the Kansas Historical Society), www.kansasmemory.org/item/211917 *See also* Letter from Governor John Martin to Attorney David Kelso (March 13, 1886) (on file with the

Kansas Historical Society), www.kansasmemory.org/item/211913_id ("The Sheriff of Labette should exhaust all the civil powers of his office, and then, if he is unlawfully resisted in the performance of all official duty, he should so notify me").

The duty to keep the peace of the entire state is placed upon the several sheriffs with the assistance and support of the state militia. This is a clear indication that the office of sheriff in Kansas retains its historic roots as the "keeper of the King's peace" and is, in reality, an officer of the State, and ultimately represents the State in fulfilling his duty to keep the peace.

## Conclusion

Kansas utilizes sheriffs to facilitate civil and criminal administration throughout thousands of square miles. The sheriffs have fulfilled this function as it is defined by the state under the supervision of the State's executive. They have, and continue to serve the state and its policies as directed. The sheriffs service to the state, and the state's control of the sheriff remains close to its roots of the sovereign and his agent and not that of a local government policymaker.

Respectfully Submitted,

WATKINS CALCARA, CHTD.

/s/ ALLEN G. GLENDENNING
Allen G. Glendenning, #12187
Michael C. Abbott #28111
1321 Main - Suite 300
P.O. Drawer 1110
Great Bend, KS 67530

(620) 792-8231 FAX (620) 792-2775
aglenden@wcrf.com
Attorneys for Kansas Sheriffs' Association

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume and word count limitation of Fed. R. App. P. 29(a)(5) because:

[ ] this document contains 14 pages and 3,269 words

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ ] this document has been prepared in a proportionally spaced typeface using Microsoft Office Word, in Times New Roman size 14.

Date: September 25, 2019

WATKINS CALCARA, CHTD.

   /s/  ALLEN G. GLENDENNING
            Allen G. Glendenning, #12187
            Michael C. Abbott #28111
            1321 Main - Suite 300
            P.O. Drawer 1110
            Great Bend, KS 67530
            (620) 792-8231 FAX (620) 792-2775
            aglenden@wcrf.com
            Attorney for Kansas Sheriffs' Association

CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing Amicus Brief:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, {eset Endpoint Security, 7.1.2053.0, 09/24/2019}, and according to the program are free of viruses.

/s/  ALLEN G. GLENDENNING
Allen G. Glendenning, #12187

CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2019, I electronically filed the foregoing Amicus Brief using the court's CM/ECF system which will send notification of such filing to all counsel of record.

Toby Crouse
CROUSE, LLC
11184 Antioch, No. 253
Overland Park, KS 66210
tcrouse@crousellc.com
Attorney for Defendant-Appellant Sheriff Gay

David R. Rogers
Kelsey N. Frobisher
FOULSTON SIEFKIN LLP
1551 North Waterfront Parkway, Suite 100
Wichita, KS 67206-4466
drogers@foulston.com
Attorneys for Defendant-Appellant Sheriff Gay

Arthur Loevy
Johnathan Loevy
Joshua Loevy
Mark Loevy-Reyes
Debra Loevy
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
Debra@exonerationproject.org
Attorneys for Plaintiff/Appellee

    In addition, I have served seven exact copies via UPS overnight delivery to:

U.S. Court of Appeals
Office of the Clerk
Byron White Untied States Courthouse
18/23 Stout Street
Denver, CO 80257

               WATKINS CALCARA, CHTD.

       /s/  ALLEN G. GLENDENNING
          Allen G. Glendenning, #12187
          Michael C. Abbott #28111
          1321 Main - Suite 300
          P.O. Drawer 1110
          Great Bend, KS 67530
          (620) 792-8231 FAX (620) 792-2775
          aglenden@wcrf.com
          Attorney for Kansas Sheriffs' Association